offers is that rebuttal time is reserved for rebuttal only. And with that we'll call case number 19-30049, U.S. v. James. Ms. Rhodes. Good morning. My name is Celia Rhodes with the Federal Public Defender's Office and I represent Ms. James. This case is about the free from government intrusion. Prosecutors are asking to override Ms. James' substantial liberty interest in refusing unwanted medical treatment and forcibly inject her with anti-psychotic drugs against her will solely in the hopes that doing so will render her competent to stand trial. Now that's an extreme request. The Supreme Court has held that the government can only forcibly medicate defendants to restore competency in rare and limited circumstances. Forcible medication is a violent intrusion that's not automatically permitted just because a prosecutor can't proceed with a case due to mental illness. And in fact, it's constitutionally prohibited absent an extraordinary showing by the state as Justice Kennedy put it in his decision in Briggins. And that's why the Supreme Court in Seattle established a detailed and intentionally demanding standard that makes forcible medication orders the exception and not the rule. So prosecutors bear the heavy burden of producing clear and convincing evidence proving each of cells for highly specific and independent requirements. Okay, let me ask you. All of the evidence that was presented clearly and as I understand it unequivocally and without exception said that administering these drugs to her was acceptable in her interest and interest went through all of the criterion for administering the drug. And the government offered no evidence, I mean you, the defendant, offered no evidence to the contrary. So if all of that evidence is competent, which it was, I mean they went through many, many tests, many psychiatrists and so on, and you offered nothing, you stood there just silent as a witness. Why isn't that clear and convincing? So a couple of things I want to point out. First is the evidentiary burden here is important. So just like at a trial where proof needs to be beyond a reasonable doubt, where the government holds an evidentiary burden, the defendant has no obligation to present evidence. Okay, so you're telling me it was a deliberate choice on your part not to put on any witnesses that would have counted this overwhelming unconfident testimony that it was the appropriate thing to do? So yeah, I actually disagree that the evidence was overwhelming at all. In fact, in defense counsel below pointed out in her written objections, on the second prong in particular, which I think is... Okay, what was wrong with it? So for example, I think that the cleanest and most glaring error is on that second prong of self, where prosecutors are required to show that the proposed treatment plan is significantly likely to further the interest of bringing Ms. James to trial. And I think the most important prong here in this case is the first... What evidence did you offer to counter the government's evidence on that point? Your Honor, it's not the defendant's burden to prove that something... I understand you've said that. I understand that. I think as defense counsel pointed out in her written opposition, that the government presented essentially no evidence proving the likelihood of success, which is the specific cell requirement. Under cell, the prosecutors had the obligation to prove that the specific proposed treatment plan, and I know you've talked about multiple psychologists, but the proposed treatment plan was proposed by a single psychologist who did not testify and was after defense experts, the defense's experts diagnosed Ms. James with an entirely different condition of schizophrenia. So they're required to show that that proposed treatment plan is substantially likely to result in competency, and that's aiming... That element of cell is aiming at ensuring a high probability of success. Now... Why do you think the record here doesn't satisfy that? Because... So I think, you know, the government in its brief, I think somewhat oddly, claims that five BOP officials, quote, opined that Ms. James was substantially likely to gain competence through antipsychotic medication, but that's not reflected in the record. Prosecutors and BOP officials essentially ignored this requirement. So, for example, the government cites to a BOP statement that forcible medication is the standard treatment for delusional disorder, and that's their support that a doctor opined that it was substantially likely. But, of course, that doesn't prove that a treatment plan is substantially likely, and in fact, the Fourth Circuit in Evans rejected that exact logical fallacy. Just because something is the standard treatment doesn't prove its cite to a one-page letter. Well, then what makes it a standard treatment? I would have thought that the standard of care, once you stipulate to that, or I'm not saying stipulate it, but once the record establishes that it's the standard of care and you offer nothing to rebut, why can't we, A, assume that that's the standard of care, and, B, assume that the reason doctors have agreed that that's the standard of care is because it's the most likely to succeed? Well, I think that what you're getting at is actually the fourth wrong. So I think it's really important to remember that this is a checklist, where each independent cell requirement is mandated. So it's true that under the fourth prong, it's relevant whether something is the standard of care, because the question is whether it's in someone's best medical interest. But the question specifically under cell's second prong is the likelihood of success. And you'll notice — In terms of furthering, allowing them to be competent to stand trial. Exactly. I get that the fourth is about medical, the second is about the trial. Exactly. But again — Okay, so your point — I thought you were arguing about the deficiencies under the second prong. And I — Okay, so what is your argument on the second prong? Likelihood of success. So you'll notice that in the vast sort of authority on this under cell cases, prosecutors actually put on qualified experts who estimate the likelihood of success. So the point under this prong is you have to show that it's substantially likely, which is a certain percentage point. And that's true of the cases the government relies on. So in Breedlove, the doctors relied on a study that showed a 93% success rate for that forcible injection treatment plan. So that medication for that particular condition. And in Gillenwater, multiple studies indicated a 70% success rate. And that is a fairly universally true principle, that courts mandate that experts get on the scene and they actually estimate the likelihood, which makes sense. But we have Dr. Silvas, and as I read the second cell factor, it requires that the government demonstrate that the administration of the drug is substantially likely, which is what you just said, substantially likely to both render the defendant competent to stand trial, which I think is covered by Dr. Silvas, among others, as well as substantially unlikely to have side effects that would significantly interfere with the defendant's ability to assist counsel. So are you saying that the government failed on both — in both factors? Yes. I'm saying that the government failed to produce clear and convincing evidence. Clear and convincing. Yes. Exactly. And I think that you're — I'm glad that you brought up that citation to that single time. That's the only time in the record when anyone opines that this treatment plan is substantially likely to happen. And that's Dr. Silvas. But the district judge did say, contrary to some of the other factors in this case, I believe the district judge did say clear and convincing evidence in his — on the record, right? Yes. In his findings on the record. Okay. And which you obviously disagree with. Now, on the fourth factor, which do you think is your strongest argument? The second, the failure of the government to satisfy factor number two under cells, or number four? I would say that those are the two probably most obvious errors. Okay. I think that two is easy, because we have this — these huge number of cell cases that tell you exactly the type of evidence that you have to put forward. And again, I think it's important to remember, this isn't a preponderance, right? So if this were a preponderance standard, I think just having a BOP official parrot the legal standard under a clear error review probably would be fine. But under a clear and convincing evidence standard — and the Fourth Circuit has specifically addressed this and said putting an expert or a BOP official on the stand and having him just parrot the legal standard with no supporting evidence whatsoever does not qualify as clear and convincing evidence. And that's why in all of those cases, prosecutors are putting experts on the stand who say, okay, well, I've looked at these studies. And in five studies, the success rate ranges from, you know, say 70 to 93 percent. And that's how district courts are able to determine whether that constitutional bar — because that's important. This is a legal standard that district courts have to apply. So whether, based on that evidence, that constitutional bar of substantial likelihood has been met, because the idea is that prosecutors — Your point is the United States didn't present some sort of scientific statistical study that had a percentage chance of this proving competence at trial. Yes. So I'm saying the only evidence is that one statement by Dr. Silvas, and that is facial insufficiency. Okay. So one of two possibilities, then, in this case. Let's say there's a vacate or remand in this case, hypothetically. One of two possibilities. The United States presents such evidence, in which case I take it that you would concede that it's satisfied, or that such evidence simply doesn't exist for this particular fact pattern. What is your view on those situations? So I think that the — so if this Court decides that the government's evidence in the record is insufficient, I think that the more appropriate course, which is what the Ninth Circuit and the Fourth Circuit have done multiple times, is to just render. Because the government had full and fair opportunity to put its evidence in the record. This is a pretrial detainee. Okay. Fair enough. Then just going forward, just as a matter of precedence, are you saying that if scientists all swear up and down, look, we have not had a chance to do a study, there have not been enough data points, what then? Oh, that would — They've done the best that they can, given the available scientific evidence at that time. At that point, you could just never leave? Is it your view that that would be enough, because they've done the best that they can, or that you can never involuntarily medicate in those situations? So this actually comes up in cases. And I've seen no case where the evidence is this thin, where prosecutors didn't even provide a likelihood. But it has been the case that courts have rejected studies and said that sample size is too small, because it has to be an indicator of success. And, you know, it's true that if there's some super rare disorder where we don't know what the treatment is yet and what's going to be effective, they're not going to be able to produce a study. But the point under Sell is, at that point, they shouldn't be allowed to medicate the person. So then how do you get such a study? They're — Back up. This is a — I mean, if you're — if United States courts, at least, are that would apply to state proceedings as well as federal proceedings. Mm-hmm. So thankfully — thankfully, mental illness is well-studied. So going through the cases, even with affirmance rates, Dillon in this — in D.C. Circuit found — cited studies that had a 73 percent likelihood. Nicholas, 70 percent. In Fazio, they were able to — to present multiple studies. So that hasn't been a problem. Are they testing for competence to do other things in daily life, just not trial? Since I'm presuming that you can never get to trial because you will always run into this problem. So these are — these are competency studies. In fact — Just general competence. One — yes. So one study was rejected because it didn't examine competence. It examined sort of a more broadly applicable standard of, you know, just improvement, which is what doctors outside the prison context would be looking at. So it has to be — you know, courts have rejected studies because it's not about the specific condition, because it's not sufficiently reliable, or it's not the specific proposed medication, which Cell itself said is necessary. You have to look at the specific medication because different medications are going to have different side effects and different likelihood of success. So it's important to have specific data to that. And we have no data. So we don't even know — we have no idea what the basis for that conclusion is. And we don't even know what Dr. Silva's meant by substantially likely. That's a legal standard. So we can't possibly know if that means the 70 percent threshold, which is what has sort of universally been accepted. The — you had the opportunity — were you the trial attorney in this case? No, I wasn't. Had the opportunity to cross-examine, could ask all of these questions of them, about them, and did not, as I understand it. And — go ahead, if you're going to — I was going to say that actually on cross-examination, counsel did bring up this point. So for the first — And what was the response of the — what was the response of the doctors on that? What was the response, sorry? Of the doctors. So the first doctor who testified that she wasn't qualified to opine on medication — so I think her testimony doesn't really matter — counsel asked her, well, what are you sort of basing your recommendations on, that she be medicated? And she said, well, over my four-year career at BOP, I've seen 10 patients with delusional disorder. And she couldn't quite remember off the top of her head, so she wasn't able to provide good statistics. So that was her response. The other doctor, Dr. Silvis, the counsel pressed him and said, well, how can — you know, how do you know that this is going to work? And he admitted, he said, delusional disorder is difficult to treat. It depends on the personality of the patient, though he didn't explain how that would impact the substantial likelihood for Ms. James. And just went on to say, you know, I don't know. So when pressed — Well, but, I mean, I guess that would be the response of any doctor, that I don't know how it's going to work. It works in 70 percent of the cases. I don't know whether she's in 30 percent of the 70 percent. Well, I'm glad you brought that up, Your Honor, because courts actually require more than what I'm even talking about. So they don't require a doctor to say, well, 70 percent of cases generally. Courts require specific evidence to that defendant, which is why it's important that the doctor — And how can you do specific evidence to that defendant? As I understood it, the only evidence that indicated, well, the more serious, like the — there was one particular possibility of serious injury to her. What was that on — Tardive dyskinesia? Yeah. You're right. Yes. On Tardive. That's a really good example. So — Now, on that, they said that the only thing that they said, as I understand it, is that this is something that happens to middle-aged persons more than any other group, and she was middle-aged. Yes. But that's all they said. There was no other kind of characteristic. And women also. So does that mean that no middle-aged women can be medicated for the purposes of competence for trial? Unfortunately, BOP, unlike other cases, didn't address this. So to your question about how doctors — No, I'm asking you what your position is. So I think that that means that when Dr. Silvas testified, oh, don't worry, this condition is rare, but we have a treatment plan that says, oh, we'll wait — I'm asking you the other question, though. Yes. Does that mean that no middle-aged women can ever be drugged for the purpose of making them competent for trial? I think that's very possible. But we have no idea because the government failed to submit the clear and convincing evidence it needed to, to show the probability of the serious side effects occurring in this particular patient. They couldn't. They couldn't — there was no way — how would you suggest that they show in that particular — they said there was no characteristic, as I understand it, that would subject her to any particular reaction to this, other than the fact that she was a middle-aged woman, where it happens most often. So I think that Judge — Your Honor, do you mind if I — Please. You can go ahead and answer her, then. Well, anyway, I'm being argumentative. No, no, no. I think it's — I think it's a good question. I think Judge Vance's opinion, her cell order in Algier, is a really, really good model for this. So what she does is she goes through every single side effect, and she lists — Okay, you've answered my question. Thank you. You've saved time for rebuttal. Ms. Carboni. May it please the Court. My name is Maria Carboni, and I am trial counsel on behalf of the United States in this matter, and I'm joined here today with my co-counsel, Ryan McLaren. I submit to the Court that we actually have a very straightforward case. This isn't even a battle of the experts, because as Your Honors noted, the experts, in fact, agree on several critical respects. The experts agree that Ms. James suffers from a persistent belief that she's being persecuted, that she lacks insight into her mental illness, and her expert, in fact, agreed with the government experts that medication is the only viable option to restore her. Did the district court apply clear and convincing evidence as the standard? Yes. The government told the court at the hearing that that would be the standard. The parties agreed, and that was addressed in the government's cell motions. And the government presented a lot of evidence in the form of two experts who testified. In fact, I'd like to — I'm sorry, you're saying — Go ahead. No, please. I was going to say, what specifically is the clear and convincing evidence that you believe is in the record regarding the fourth factor? The district court's transcript is a little unclear, and I don't think the district judge said clear and convincing when ruling on it, though he may well have applied it, as you're indicating. But it's not clear on the record in the ruling what specific evidence overcame the clear and convincing burden that the government had with regard to the fourth factor. So the fourth factor, which is whether this is medically appropriate for Ms. James. Okay, so the government had two experts testify, Dr. Blackwood, the psychologist, and Dr. Silvas, the psychiatrist. Dr. Silvas testified that this is the standard of care treatment for Ms. James' disorder. That's at page 186. And he testified that she does not have any risk factors for side effects that would be severe. That's at pages 195 to 197. The district court also had before it several different reports. So, Dr. — the report by Dr. Silvas, the report by Dr. Blackwood, that was co-authored with the PhD candidate, Ms. Evans, discussed how the defendant would benefit from symptom improvement in this case. That's at page 435. And the defendant's own expert explained, Dr. Sonia explained that this defendant had really suffered from her mental illness in a way that destroyed her personal relationships, that got her fired from her job, that resulted in her not taking care of her hygiene or grooming. She was not showering or sleeping. Her home was in disarray. And so those factors together I think show that the district court had before it substantial evidence that meets the clear and convincing standard. You mentioned Dr. Blackwood. What portions of Dr. Blackwood's testimony support the fourth and some of the others, Silvas and the report? Right. So Dr. Blackwood actually was not asked specifically about that factor at the hearing, but it was in her report. And so the page numbers for that would be 435 of her report where she talked about symptom improvement. Okay. You said that the government stipulated in the district court to the clear and convincing evidence standard? If I said stipulated, I misspoke. That's my word. But did the government propose that that be the standard? Yes. The government said at the beginning of the hearing that that would be the standard and presented evidence to meet that standard throughout. At least that's my recollection. I don't have a page number in front of me. From what I can tell, the court only applied, only used the words anyway, clear and convincing with respect to the second prong. Should that be concerning to us? It appears to me anyway that the district court didn't necessarily apply the clear and convincing standard to all four prongs, and I hear you saying that that is, in fact, the governing standard. Why is that not a reversible error right there? Well, I think that what's important is to look at the record and see whether the evidence itself did support that standard. And so I submit that the evidence in the record far exceeds a clear and convincing standard here. And so even if the court didn't explicitly say that that was the standard that it was applying, I don't think that there was any question that that was the standard that was applicable. In other words, you would you're suggesting we affirm on such alternative grounds, just affirm on the grounds that the record meets the standard that the district court didn't use? No. I would say that the court did apply that standard, didn't say that it was applying a different standard as to one factor, that it was applying to the other factors. And so, although it could have maybe said that more explicitly in its order, I think if you look at the evidence that was presented, the evidence meets that standard. I'd like to just touch on self-factor number two. Opposing counsel has raised some points about whether or not the government met its burden with respect to the fact that the medication would significantly further the government's interests. Here, the defendant's own expert offered an opinion that it was, quote, substantially likely that proper medication would render her competent. That's at page 353. Dr. Silvas at the cell hearing testified, the government asked Dr. Silvas at the test at the cell hearing whether it was substantially likely that this proposed medication would render her competent, and he said, that is my opinion, yes ma'am. And you can contrast that to his opinions that he offered at other points in the transcript. He was not merely saying, just answering yes or no to the government's questions. At other points, he would say, I have to qualify that or I need to answer further. This was someone who testified that he'd been a psychiatrist for 37 years and had treated hundreds of patients with these medications. And he testified further that he had reviewed the medical records, that he spoke with Dr. Blackwood about this case, that he had reviewed the proposed treatment plan and considered it independently whether he agreed with those recommendations, and that he spoke with the defendant herself. Dr. Blackwood submitted a letter to the court, that's at page 374, in which she stated that there was an increased likelihood that Ms. James would be rendered competent with medication in the foreseeable future. Dr. Etter is the BOP doctor who initially wrote the treatment plan, which Dr. Silvas then later reviewed and independently decided he agreed with. He stated that this medication was the only viable medical treatment likely to resolve her symptoms, that's at page 451. And I should point out, too, that the district court heard from both of the experts that there had been a BOP hearing, and that at that hearing, the chief of the psychiatry department for this facility heard testimony from different medical personnel and independently decided that she agreed that Ms. James had delusional disorder, that the proposed medication was the only effective treatment for delusional disorder, or ineffective treatment for delusional disorder, that's at page 452, and that this was medically sound and a safe treatment for her. To what extent do you agree with the defendant that the court, notwithstanding all of the testimony and the evidence that might have been available to the court, that the court itself did not thoroughly consider and analyze the medical evidence that was before him to come to the conclusions that he reached? In other words, even if the conclusions may be supportable in the record, he didn't thoroughly consider it as he should have. What is your response to that? My response is that there's a difference between whether the court considered it and whether the court explicitly talked about it in its order, and the court certainly could have had a more detailed reasoning and order. However, I'm not aware of any case requiring the court to make any particular recitations. The court on the record did talk about each of the four cell factors and say that he found the government met its burden. And the court said in its written order that it had considered the government's cell motion, which contained a lot of information about the facts of the case and which also attached the records of the administrative hearing, which showed that the chief of psychiatry agreed with this treatment plan, and which discussed Dr. Blackwood's report. So the court, although it didn't explicitly talk about each individual factor with respect to those reports, it said, having considered all of this evidence, I find that the government met its burden. And additionally, the court here, I'd just like to point out, did make a tailored order. So the court didn't just say, yes, this is okay. The court said, the court imposed requirements, including that based on the testimony he had heard, that he wanted to have Ms. James offer the proposed voluntary treatment before each injection, and he also said that he wanted to have interim reports each month about whether she was experiencing any side effects and whether she had improvement. And he wanted an interim, lengthier report at the three-month mark. And so I think that that, combined with the fact that the court during the hearing was actually asking questions of witnesses and was very engaged. Let me ask you, you mentioned just now about the court talking about evidence in connection with these factors, some evidence, but still on the fourth factor, again, I go back to the fourth cell factor, the transcript seems to indicate that he did just what the defendant's complaining about, that said the standard, which is, as the court also finds the benefits and potential, the benefits when compared to the potential side effects, that the administration of the recommended drugs are medically appropriate, which is, and then he got interrupted, and then he says, he kind of moves on off of that. So I don't see, maybe you can point somewhere in the record where the judge in connection with the fourth factor said, my decision is based upon X, Y, and Z evidence, such as what you've told me is in the record. Is there a place where the judge did that? Because I don't see it on the transcript. Well, no, and I should clarify, I was talking about the written order. In the written order, the court said, having considered the following pieces of evidence, it found that it was ordering this treatment. But it's true that the court was interrupted during the fourth cell factor. The way that I read that is he said it's medically appropriate, and he discussed the benefits and the side effects in that. Even though he was interrupted, he did address all of those things. And so... I mean, does the fourth factor bleed into the second factor as well? I mean, I noticed there was testimony there that Dr. Silvers said that it was all standard care that was being administered to her, and that the effects were rare and treatable, and that in her case she was likely to be restored to competence for the purposes of trial, and that his conclusion was that it was not likely to have any side effects based upon his experience and his review of her situation. So would that also address the fourth factor? Yes. I would say that the second and the fourth factor are related in the fact that they both consider the side effects. So the second factor is getting at whether any side effects would interfere with the defendant's ability to participate in her defense and to confer with counsel. And so that's when Dr. Silvers was testifying about things like whether she would be drowsy, and he talked about how there were ways to counter that, that often over time those things get better and there were side effect medications, and that's what that testimony goes to. And also the fact that... But then separately you look at the side effects also to determine if it's medically appropriate for this defendant, because if it's going to be an unhealthy thing, then that's not something that courts should allow to go forward. And so that's really where more serious side effects come into play. So in other words, the second prong is more about the interests of justice, the fourth prong is more about in her medical interests. Yes. Well, the second prong goes to the likelihood of success of this proposed treatment and whether, right, whether there would be... I think they're both about success, right? It just depends on success, what's successful. Two is the trial will be successful. You'll have a good defense, an appropriately fair proceeding with due process. The fourth is about her own medical self-interest. That's exactly right. Okay. In the medical, in her medical self-interest, then, is there an area that the district court or the testimony in the record, evidence, indicates there were specific problems to her that were overlooked in the evaluation of her by all these psychiatrists? I'm not aware of any alleged facts that are particular about... Has the defendant alleged specific considerations that the district court should have considered that are particular and personal to her? No. As we said in our brief, Ms. James is a healthy person physically. And so I guess aside from the tardive dyskinesia, which is more specific to which opposing counsel is discussing, which is something that women that are older are more likely to suffer, that I guess is one of the things that is more specific to this defendant. However, Dr. Silvas did address that at the hearing and talked about how not only had he never seen it in 37 years with hundreds of patients, but that one of the reasons he hasn't seen it is because they go to such lengths to ensure that they're monitoring people that have this treatment so that they can detect early on whether there are any indications that this might occur. And so he talked about an involuntary movement scale, tests that would be performed to check, how they would be talking to the defendant regularly, how she would have physical examinations so that they would know whether any of this was occurring with her. Cross-examination by the defendant. Did they bring up any particular subjects that were peculiar to her that had not been addressed or should have been addressed? I can't recall any. Was there a specific objection to the finding of the district court at the conclusion of the judge's presentation of his conclusions? Counsel did say below, essentially, Your Honor, we object to the ruling. Okay. So if there are no additional questions. At that time, did they give any grounds, specific grounds for the objection to the ruling? No, just that they objected to the ruling. And the objections that they have raised here, were any of those particular objections raised before the district court for it to take into view in its consideration of the claim? No. Well, not with respect to cell factors two, three, or four. With the governmental interest, the defense did raise for the court's consideration the prospect of civil commitment and the length of time that she had served. But with respect to these other factors, no. And, in fact, in the defendant's response to the government's cell motions, the defendant stated, essentially, we don't disagree with the findings of these reports. And I submit that that's because they're consistent with the defendant's own expert's reports in this case. So you're telling us that they made no specific objection with the court's failure to properly address the fourth consideration of cell? That's correct. At the time, no. Am I correct that the judge ruled on the record at the conclusion of the hearing that very day there was no post-hearing memoranda filed or anything like that? That's correct. The court ruled from the bench after taking a brief recess and then followed up with the written order. There were no motions for reconsideration by the defendant? That's correct. All right. I see my time is almost up, so if there are no additional questions, we submit to the court that several doctors agree that medication is the only thing likely to render Ms. James competent and that this treatment is in her medical interest. No doctor has said otherwise. So we respectfully request that this court affirm the district court's cell order. Thank you. Thank you. Ms. Rhodes, you've got five minutes for rebuttal. I mean, don't you think that failure to make any kind of objections that you're making now concerning the failures of the fourth factor, raising them for the first time in the appeal, is kind of blind-siding the government and the district judge? Your Honor, the government's wrong that these weren't raised below. I beg your pardon? The government's incorrect that these issues weren't raised below. So, for example, on page 463 is the defendant's written opposition. She specifically noted that none of the experts had opined on the substantial likelihood of success. She also noted specifically her concerns about the side effects. Where was this filed? This was filed with the district court for the cell hearing. Before the cell hearing? Yes. This is their opposition to the government's evidence. She also then provided extensive arguments following the presentation of the government's case on every single prong and contested the sufficiency of the evidence on every single prong, not just the governmental interest. So I would definitely say that these arguments are well-preserved, and the record cites for that. So you're making no arguments with respect to the fourth prong that were not presented in the district court? So the fourth prong, I can't recall exactly. She certainly contested that the fourth prong had been met. And her biggest emphasis was this idea of side effects, that there are these serious side effects. She noted in her written opposition on 464 that she was concerned about this issue, that Dr. Etter himself said that there were these increased risk factors. So I believe that everything is preserved. Now, that being said, I think that any of these errors is clear and obvious under plain error. I think it clearly also affects your substantial rights. So I'm not worried about the standard of review, but I do think that these are preserved. So did the government propose to the district court that clearing convincing evidence is a standard? I do believe that they—in the Eastern District of Louisiana, judges have—there aren't that many orders, but judges have used that standard. So I believe that the opinion that both parties were working off of was this Algier opinion from Judge Vance, which was just a really good opinion. And so I can't recall specifically if the government said this is the standard. You're comfortable that the district court applied clearing convincing evidence? I'm comfortable that the district court— In other words, you just think the district court failed it. I get that. But are you comfortable that the district court, in fact, applied clear and convincing evidence review? I think that the district court thought that that was the correct evidentiary standard. I don't think that the district court came close to satisfying the clear and convincing evidentiary standard. And that relates to another point that the government mentioned. The government couldn't recall any cases where courts have explained the type of explanation that's required. But in Watson, Ruiz-Gaxiola, Rivera-Guerrero, just to name three, courts have specifically said what's required, which is thorough analysis, and have actually said that it's reversible error in and of itself, not to engage in the type of analysis that's required on that point. Just very quickly on the second prong, because I want to—well, maybe the fourth prong is actually better to focus on, since we haven't focused on that. The evidence that the government cites for that is the sort of generic evidence about the standard of care treatment for this diagnosis. And Dr. Silvas even says that. He says, my recommendation is based on this diagnosis. So my recommendation is because she's been diagnosed with this thing, this is what we should do. But that's insufficient. So the standard here is what's in her best interest as a patient in light of her particular medical condition. And as Justice O'Connor explained, sitting by designation in Gilwater, that prong considers the long-term medical interests of the individual, not the short-term interests of the justice system, which is what prong two is focused on. And so the Seventh Circuit has said that for that, So it's not just that you can say, well, we usually prescribe this type of medication for this type of diagnosis. They have to actually provide evidence from her medical history that this will benefit her personally. And the only benefits that the government has provided are that she will be rendered competent for a very short time solely for trial purposes, because the second trial is over, as the government said at the hearing, they're going to yank her off this medication because if it goes up to a year, she starts to increase her odds of getting really serious side effects. They have to take her off that medication. The government said that and experts said that. So she'll have this very short window of competency. And then this sort of vague symptom improvement reference, which was by the intern in her report, but as Sel said with respect to this factor, we need to know the actual medication to know what types of symptoms, what types of side effects, the likelihood of success. And at that point, the treatment plan wasn't even written. So that wasn't about a particular medication, and it certainly didn't specify any particular symptoms. Thank you. Thank you. So we have your arguments. The case is submitted. And we'll ask counsel in the next case to approach.